**MAINE SCHOOL ADMINISTRATIVE
DISTRICT NUMBER 68,
Plaintiff**

v.

**JOHNSON CONTROLS,
INC., Defendant**

No. CIV.02–43–B–S.

United States District Court,
D. Maine.

Aug. 30, 2002.

Christopher B. Branson, Esq., John B. Shumadine, Esq., Murray, Plumb & Murray, Portland, ME, for Maine School Administrative District Number 68, plaintiff.

Phillip D. Buckley, Luke M. Rossignol, Esq., Rudman & Winchell, Bangor, ME, for Johnson Controls, Inc., defendant.

*ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE.*

SINGAL, District Judge.

The United States Magistrate Judge filed with the Court on July 30, 2002, her Recommended Decision. Plaintiff filed its objections to the Recommended Decision on August 15, 2002 and Defendant filed its

response to those objections on August 29, 2002. I have reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Magistrate's Judge's Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision, and determine that no further proceeding is necessary.

It is therefore *ORDERED* that the Recommended Decision of the Magistrate Judge is hereby *AFFIRMED*.

It is further *ORDERED* that Defendant's motion to stay the present action and compel arbitration is *GRANTED*.

## RECOMMENDED DECISION

KRAVCHUK, United States Magistrate Judge.

Defendant Johnson Controls, Inc. ("JCI") filed this Motion to Compel Arbitration pursuant to 9 U.S.C. §§ 3 and 4, asserting that the operative contract between it and Plaintiff Maine School Administrative District Number 68 ("MSAD 68") requires all disputes not resolved by negotiation to be resolved by arbitration. (Docket No. 5.) I recommend that the Court **GRANT** JCI's motion to stay the present action and to compel arbitration.

### Applicable Legal Framework

MSAD 68 filed a five-count complaint in the Maine Superior Court against JCI in February, 2002, seeking damages and restitution for JCI's alleged negligence, misrepresentation, unjust enrichment, breach of contract, and breach of warranty. According to the complaint, JCI, a Wisconsin corporation, released friable asbestos while performing services at the SeDoMoCha Middle School in Dover Foxcroft under three contracts. The action was removed to this Court upon JCI's petition for removal which was filed soon after the complaint was filed. On April 16, 2002, JCI filed the present motion to stay proceedings and to compel arbitration asserting that the claims relate to services JCI provided pursuant to the Service Agreement which contains an arbitration clause.

 JCI brings this motion pursuant to §§ 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. Section 3 of the FAA states that where a suit or proceeding brought in the court is referable to arbitration pursuant to a written agreement by the parties, the court upon being satisfied that the issue is referable should stay the trial until arbitration has been had.[1] 9 U.S.C. § 3. Section 4, in part, states that the court shall issue an order directing the parties to arbitrate the dispute as required by the parties' agreement to arbitrate. 9 U.S.C. § 4. The Court's consideration of a motion to compel arbitration involves the determination of whether there is an agreement to arbitrate, whether the dispute in question falls within the scope of that arbitration agreement, and whether the party seeking arbitration has waived the right to compel arbitration. *Bangor Hydro–Electric Co. v. New England Tel. & Tel. Co.*, 62 F.Supp.2d 152, 155 (D.Me.1999) (citing *Brennan v. King*, 139 F.3d 258, 263–67 (1st Cir.1998)). "[Q]uestions of arbitrabili-

---

1. In diversity jurisdiction actions such as this, § 3 may be invoked only where the suit is grounded in a maritime transaction or in transactions involving commerce. *Bangor Hydro–Electric Co. v. New England Tel. & Tel. Co.*, 62 F.Supp.2d 152, 156 n. 4 (D.Me.1999) (citing *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 201—202, 76 S.Ct. 273, 100 L.Ed. 199 (1956)). As neither MSAD 68 nor JCI addressed this requirement in its memorandum and as JCI brings its motion to compel pursuant to §§ 3 and 4, I will assume that the parties agree that this case implicates a transaction involving commerce. *See id.*

ty must be addressed with a healthy regard for the federal policy favoring arbitration." *Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 528 (1st Cir.1985) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). All doubts concerning the scope of arbitrable issues are resolved in favor of arbitration. *Id.* "However, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Large v. Conseco Finance Servicing Corp.*, 292 F.3d 49, 52 (1st Cir.2002) (citing *McCarthy v. Azure*, 22 F.3d 351, 354 (1st Cir.1994)). A motion to compel arbitration will be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *See Unionmutual Stock Life Ins.*, 774 F.2d at 528.

### Discussion

#### 1. Does an Agreement to Arbitrate Exist Between the Parties?

■ The parties do not dispute that they entered into the Service Agreement and that the Service Agreement contains an arbitration clause. However, MSAD 68 raises an issue relevant at this juncture: whether the arbitration clause remains effective after the contract has expired. (*See* Pl.'s Additional Resp. to Mot. to Compel Arbitration.) The Service Agreement expired by its own terms on July 1, 2001. (*Id.*) The asbestos release forming the basis of this action allegedly occurred in 1999 and the complaint was filed in February of 2002. JCI ceased providing services to MSAD 68 in 1999, although all of the contracts between the parties were not formally terminated until 2000. (*Id.*) MSAD 68 argues that between its December 2000 Notice of Claim and the Service Agreement's expiration on July 1, 2001,

JCI had the opportunity to request arbitration before the Service Agreement expired, but did not do so. In MSAD 68's view, the expiration of the Agreement terminates JCI's ability to request arbitration under the Agreement.

■ This argument has no merit based on the facts of this case. Disputes that arise under a contract prior to its expiration are subject to the arbitration clause contained within the contract. *See Nolde Brothers, Inc. v. Local No. 358 Bakery and Confectionery Workers Union*, 430 U.S. 243, 251, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977) (rejecting the notion that an arbitration clause contained in an expired contract is not effective against a claim arising during the life of the contract and citing *John Wiley & Sons v. Livingston*, 376 U.S. 543, 555, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)). A claim brought after the expiration of a contract is found to "arise under a contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton Financial Printing Division, Inc. v. NLRB*, 501 U.S. 190, 205–206, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). Here the dispute involves facts and occurrences that arose in 1999 (i.e. the release of asbestos), therefore the claims arose prior to the July 1, 2001 expiration of the contract. Thus, the arbitration clause survives the expiration of the contract.

As the parties agree that an agreement to arbitrate existed, this case focuses on whether the claims against JCI fall within the scope of the arbitration clause and whether JCI has waived its right to compel arbitration.

## 2. Does the Dispute Fall Within the Scope of the Arbitration Agreement?

A preliminary issue must be addressed prior to determining the scope of the arbitration clause. MSAD 68 argues that asbestos was released at a time when JCI was performing services for MSAD 68 under three separate written contracts. According to MSAD 68, the injury-causing services were performed under one of the contracts that does not contain an arbitration clause. The parties agree that at the relevant time frame three contracts were in effect: the Equipment Lease, the Service Agreement, and the Comprehensive Energy Conservation Program. The Equipment Lease relates to the oil burner and the heating, ventilation, and air conditioning ("HVAC") management system. (Pl.'s Resp. to Mot. to Compel Arbitration (PRMCA) at 9; Ex. A.) The Service Agreement covers maintenance of certain portions of the HVAC system and is the only contract containing the arbitration clause. (*Id.;* Ex. B.) The Assurance Performance Guarantee (also referred to as the Comprehensive Energy Conservation Program) is an energy conservation contract that includes annual inspection of the HVAC system and other work related to the HVAC system. (*Id.;* Ex. C.) This work generally does not consist of a great deal of physical labor; it consists of tasks such as taking samples, changing light bulbs, installing the management energy system, and completing energy reports. (Elliott Dep. at 21, 23, 26.)

Although MSAD 68 suggests that the three contracts do not relate to each other (PRMCA at 9), the contracts, each signed in April of 1994, indicate otherwise. The warranty language in paragraph ten of the Equipment Lease is crossed out and paragraph five of the attached addendum provides substitute warranty language. This new language states that the equipment installed under the Equipment Lease has a warranty of eighty-four months "so long as JCI's Standard Maintenance Agreement is in full force [and] in effect with Lessee, or maintenance with JCI's written consent." (Ex. A at Addendum ¶ 5.) The Assured Performance Guarantee (Ex. C) has "84" typed in the blank indicating the guarantee term. (Ex. C at 1.) The Equipment Lease further states that the lessee "at its expense shall enter into, and maintain in full force and effect for the duration of this Agreement, JCI's Standard Maintenance Contract, and shall comply with all Lessee's obligations thereunder" and that "[a]n alternative source of maintenance may be used with JCI's prior written consent." (Ex. A ¶ (11).) A subparagraph immediately following states "Notwithstanding the foregoing, if the lessee and JCI have entered into an Assured Performance Guarantee specifying savings to be achieved by the Lessee, the Lessee must enter into JCI's Standard Maintenance Contract." (Ex. A ¶ (11)(B).) The parties did just that, as indicated by the existence of the Assured Performance Guarantee (Ex. C) and the Planned Service Agreement (Ex. B). The conclusion that the three contracts are interrelated, rather than separate unrelated contracts, is further supported by the fact that the summary of charges to MSAD 68 for the Equipment Lease specifically includes the annual charges for the Service Agreement. (*See* Ex. B at 2 "Supplemental Price and Payment Terms"; Ex. A at 2 "Summary of Charges: Service Payment"). These provisions clarify that the services provided under the Equipment Lease are provided specifically through the Service Agreement.

The Assured Performance Guarantee provides for minimal services and services of a specific nature. The injury forming the basis of the claims allegedly occurred during JCI's repair to leaking pipes. (Compl. ¶ 8, 10, 11–14.) It is not conceiva-

ble that the repair of a leaky pipe would have been performed under the Assured Performance Guarantee.

In contrast, the Service Agreement provides a premium coverage, which was chosen in this contract (Ex. B at 1), that includes the basic coverage as well as repair labor and repair material if noted in the agreement for covered equipment. (*Id.* ¶ (2)(b).) Thus, MSAD 68 was covered for scheduled service visits (i.e. labor required to perform inspections and preventative maintenance on covered equipment), scheduled service materials (i.e. materials required during the scheduled visits), repair labor (i.e. services necessary to restore covered equipment to working condition after a equipment failure), and repair materials (i.e. materials required during repair labor). (Ex. B at ¶ (2)(a)-(b) and ¶ (1)(c)-(f).) Consequently, the only written contract that the work could have been performed under is the Service Agreement, which contains the arbitration clause.

██ Having found that the claims could not have risen from the Equipment Lease or the Assured Performance Contract, but *may* have risen from the Service Agreement containing the arbitration clause, I next determine whether MSAD 68's claims fall within the scope of the arbitration clause. The arbitration clause in relevant part states:

> If a dispute arises, the parties shall promptly attempt in good faith to resolve the dispute by negotiation. All disputes not resolved by negotiation shall be resolved in accordance with the Commercial Rules of the American Arbitration Association in effect at that time, except as modified herein. All disputes shall be decided by a single arbitrator. . . . .

(Ex. B "Resolution of Disputes" ¶ O).

██ Applying contract law principles, "courts have consistently drawn a distinc-tion between narrow arbitration clauses specifically identifying the issues to which they apply and broader forms of arbitration clauses." *Fluehmann v. Associates Financial Services,* 2002 WL 500564, *6 (D.Mass. Mar 29, 2002) (citing *Elzinga & Volkers, Inc. v. LSSC Corp.,* 47 F.3d 879, 881 (7th Cir.1995) and *Local Union No. 637, IBEW v. Davis H. Elliot Co.,* 13 F.3d 129, 132–133 (4th Cir.1993)). This distinction is relevant because "[t]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Smith/Enron Cogeneration Ltd. P'ship. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 99 (2nd Cir. 1999), *cert denied,* 531 U.S. 815, 121 S.Ct. 51, 148 L.Ed.2d 20 (2000) (citing *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2nd Cir.1997)). The plain language of this clause shows that the parties intended to arbitrate "all disputes" that are not resolved by negotiation, therefore this is a broad clause. *Cf. Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 36 (5th Cir.1990) (finding the clause covering "any and all disputes" to be a broad clause and finding that through the clause the parties intended to reach all aspects of the parties' relationship). Unquestionably, this broad clause would apply to a dispute between the parties regarding JCI's liability for harm alleged to have occurred while it performed services under the Service Agreement.

MSAD 68 asserts however that the Service Agreement does not apply to its claims because the injury-causing services fall within the exclusion in the agreement. The Service Agreement contains an exclusionary section that states "JCI's services under this agreement do not include:" and lists consumable goods and various circumstances in which service may be requested,

including "the repair or replacement of . . . hydronic and pneumatic piping, . . . and piping not normally replaced or maintained on a scheduled basis. . . ." (Ex. B at ¶ G(7).) This exclusionary section does not state that these are exclusions from the applicability of the arbitration clause, it simply provides that the services listed are not services JCI is responsible for providing under the contract.[2] JCI claims that the Service Agreement provides MSAD 68 with all-inclusive coverage of the heating system, therefore there have only been a few occasions where the services it performed did not fall within the Agreement. JCI reports that none of those occasions relate to MSAD 68's claims. To the contrary, MSAD 68 states that the asbestos release occurred when JCI performed services falling within the exclusionary section, namely repair to leaky pipes. (PRMCA at 12; Ex. B at ¶ G.) It is MSAD 68's contention that disputes regarding services that fall within one of the exclusions listed in the Service Agreement are not subject to the arbitration clause. It is not clear however that the claims alleged against JCI are based on services that all fall within the exclusion section.

Counts IV and V alleging breach of contract and breach of warranty clearly fall within the scope of the broad arbitration clause. As to the remaining counts, the claims in the complaint are based on at least one service call performed by JCI that may have been provided under the Service Agreement. (Compl. ¶ 9.) In regard to this service, MSAD 68 cites to Gilbert's deposition and states that "Gilbert admits working on the pipe in the [b]oiler [r]oom where asbestos had been removed." (PRMCA at 13.) According to the record, Gilbert actually stated that he worked on the valve head that attaches to the valve body, not the pipe. (Gilbert Dep. at 131.) Thus, without deciding the merits of the claims, I find that at least a portion of MSAD 68's action may involve services provided under the Service Agreement. MSAD 68 further asserts that Durwood Thompson, a custodian at the SeDoMoCha Middle School, claims he saw Gilbert remove asbestos insulation from a pipe and leave it on the floor of the boiler room. (PRMCA at 11; Thompson Aff. ¶ 8.) However, it is not clear that this removal occurred during the "repair or replacement of hydronic and pneumatic piping" or of "piping not normally replaced or maintained on a scheduled basis," as stated in the exclusion relied on by MSAD 68. (Ex. B at ¶ G(7).) Additionally, MSAD 68 holds firmly to the statement Gilbert allegedly made when the release of asbestos was discovered:

I removed the mud covering on the pipe fitting to enable replacement of the leaking pipe fitting. I placed several pieces of the mud fitting on adjacent ceiling tiles. At the time, I did not know what the material was. I now understand that the mud fittings are asbestos. . . .

(Winkle Aff. ¶ 5.)

Here, Gilbert does not say that he repaired or replaced the pipe or was about to do so; he only states that he removed the covering *to enable* the replacement of the fitting. Further, although Gilbert stated in his deposition that he routinely repairs pipes during service calls, he does not state that he has ever done so at SeDoMoCha Middle School. (Gilbert Dep. at 173–175, 194.) It cannot be said that all of the

2. Examples of other excluded services are services provided in response to calls resulting from equipment not covered by the agreement, services resulting from the effects of erosion or corrosion, services resulting from adjustments or repair to covered equipment performed by unauthorized persons, and services caused by the negligence of others. (Ex. B. at ¶ G(6), (8), (9), (10).)

injury-causing services that form the basis of the claims fall within the exclusion, as it is conceivable from the wording of the complaint that at least part of the claims may have risen under the Service Agreement. (*See* Compl. ¶¶ 3–6, 8–9, 25–27, 29–31.)

If a dispute arose between the parties regarding whether JCI can bill MSAD 68 for a particular service (i.e. a dispute regarding whether a particular service is covered and unbillable under the Service Agreement as opposed to excluded from the services to be provided and therefore billable), there is no doubt the dispute would be subject to the arbitration clause. To find that the arbitration clause does not apply to the present dispute because it may involve service that is excluded from the contract would be contrary to the broad language in the arbitration clause. Furthermore, such a conclusion would contravene the principles regarding arbitration. Under these principles, "arbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Neal*, 918 F.2d at 37. It cannot be said with positive assurance that the arbitration clause does not cover MSAD 68's claims against JCI arising from the services it provided. The exclusion section is not an exclusion from arbitration. It simply states that JCI is not required to provide certain services; therefore, when these services are performed they are billable. The parties' course of conduct bears this out. (*See* Ex. 2 attached to Def.'s Reply to Pl.'s Resp. Mot. to Compel Arbitration, "Call Type"; Elliott Dep. at 66–75.) In light of the broad arbitration clause and the principles guiding the Court, the claims alleged in the complaint fall within the scope of arbitration clause.

### 3. Did JCI Waive its Right to Compel Arbitration?

■ MSAD 68 asserts that JCI waived its right to compel arbitration because JCI failed to request arbitration for nearly three years. (PRMCA at 5.) As MSAD 68 correctly notes, a party may waive a contractual right to arbitration through its course of conduct. *See Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 221 (1st Cir.1995). In asserting waiver occurred, MSAD 68 relies on *Navieros Inter–Americanos, S.A. v. M/V Vasilia Express*, 120 F.3d 304 (1st Cir.1997) in which the First Circuit Court of Appeals found that a one-month delay was sufficient to support a finding of waiver. *Navieros*, 120 F.3d at 316. However, the facts of that case distinguish it from the present. In *Navieros*, the litigation was expedited therefore the month long delay encompassed the time from filing the complaint up to the eve of trial. *Id.* In the present case, the parties did not "scramble to prepare their cases for trial, incurring expenses that would not have been occasioned for an arbitration." *See id.* Furthermore, JCI is not seeking arbitration after a change of position on the eve of trial. *See id.*

MSAD 68 further argues that JCI engaged in litigation in this matter, which may also be viewed as a waiver of the right to compel arbitration. *See id.* In support of this argument, MSAD 68 states that after the complaint was filed, JCI elected to remove the matter to this Court rather than seek arbitration. (PRMCA at 6.) MSAD 68 asserts that although JCI's answer to the complaint references the arbitration provision, JCI failed to request arbitration at that time. According to MSAD 68, JCI's failure to request arbitration allowed the Court to enter a Scheduling Order which required the parties to proceed with discovery. Additionally, JCI

participated in discovery and waited until after it received the benefits of discovery, not otherwise available to them under the arbitration provision, to request arbitration.[3] (PRMCA at 7.)

■ The Court's determination of whether waiver of a right to compel arbitration has occurred is guided by the following factors established by the First Circuit:

> ... whether the party has actually participated in the lawsuit or has taken other action inconsistent with his right, ... whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit by the time an intention to arbitrate was communicated by the defendant to the plaintiff, ... whether there has been a long delay in seeking the stay or whether the enforcement of arbitration was brought up when trial was near at hand.... whether the defendants have invoked the jurisdiction of the court by filing a counterclaim without asking for a stay of the proceedings, ... whether important intervening steps (e.g., taking advantage of judicial discovery procedures not available in arbitration ...) had taken place, ... and whether the other party was affected, misled, or prejudiced by the delay....

*Creative Solutions Group, Inc. v. Pentzer Corp.*, 252 F.3d 28, 32 (1st Cir.2001) (citing *Jones Motor Co. v. Chauffeurs, Teamsters, and Helpers Local Union No. 633*, 671 F.2d 38, 44 (1st Cir.1982)).

■ The majority of these factors, applied to the facts, do not lead to the conclusion that JCI waived its right to arbitra-

tion. The complaint was filed February 13, 2002, and JCI answered to the complaint on March 13, 2002. (Docket No. 2.) JCI's answer includes as a defense the assertion that the action is barred due to the arbitration clause. (Docket No. 2 at ¶ 8.) Three days later, on March 16, 2002, JCI removed the action to this Court. JCI filed the motion to compel arbitration on April 16, 2002, just three weeks after the Scheduling Order was issued and approximately two months after the complaint was filed. Thus, the delay in JCI's seeking arbitration lasted approximately two months after the complaint was filed. Further, JCI did not file a counterclaim. Additionally, the parties are not at the eve of trial nor are they far in the litigation process.

The fact that discovery occurred cannot be considered a waiver as it was at the request of MSAD 68 that I subjected JCI to discovery. JCI filed its motion to compel arbitration approximately a week before MSAD 68 was to serve its initial disclosures. (*See* Docket No. 4.) MSAD 68 asserts that its initial disclosure included production of over a thousand pages of internal documents. (PRMCA at 7.) At that time, JCI sought a stay of discovery pending the disposition of the motion to compel arbitration. MSAD 68 objected to the stay and the parties ultimately engaged in limited discovery because I granted MSAD 68's request to do so over JCI's objection. [*See* Docket No. 6 (order), Docket No. 7 (endorsement), Docket No. 8 (order), and Docket No. 9 (order) for a history of the contentious "limited" discovery.] JCI cannot be docked for engag-

---

**3.** MSAD 68 adds a final note that the arbitration provision requires that a "demand for arbitration" be made and filed with the American Arbitration Association ("AAA"), which JCI did not do. (PRMCA at 7.) While the arbitration clause itself does not state that a demand filed with the AAA is a prerequisite, it may indeed be a requirement imposed by the AAA or some other source. I am not aware of authority for the proposition that a failure to file such a formal demand, if indeed it is required under the law, automatically equates with a waiver of the right to arbitrate.

ing in discovery in response to my Orders. As this is the extent of the judicial proceedings engaged in by the parties, it cannot be said that the "litigation machinery" has been "substantially invoked" here. *See Creative Solutions Group, Inc.,* 252 F.3d at 32 (stating that "a party may, by engaging in litigation, implicitly waive its contractual right to arbitrate" and citing *Navieros,* 120 F.3d at 316.) Thus, facts do not indicate that JCI has waived its right to request arbitration.

Furthermore, MSAD 68 has not shown that it has been prejudiced as a result of JCI's failure to assert arbitration. *See Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 807 F.2d 16, 19 (1st Cir.1986) (stating that a party alleging waiver has occurred must show prejudice in order to prevail). MSAD 68 claims it was prejudiced by the "three-year" delay (the time from its December 2000 Notice of Claim up to JCI's motion to compel filed April 16, 2002, is a period of approximately sixteen months) in JCI's request for arbitration because it resulted in "substantial" legal fees being incurred to pursue litigation.[4] (PRMCA at 8.) The waiver of the right to arbitration is not lightly inferred based solely on mere delay in seeking arbitration unless the delay results in prejudice to a party. *Creative Solutions Group, Inc.,* 252 F.3d at 32 (quoting *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 806 F.2d 291, 293 (1st Cir.1986)). As the delay here was not significant once it became apparent that the matter was actually headed to court in February, 2002, the parties are not far in the litigation process, and as MSAD 68 has not shown prejudice, I find that JCI did not waive its right to

compel arbitration. *Cf. Sevinor,* 807 F.2d at 19 (finding no prejudice or waiver where answer to complaint included arbitration as a defense and motion to compel was filed seven months after complaint even though plaintiff had replied to 300 interrogatories and twelve requests for the production of documents and the defendants had continually sought continuances of their deadlines to respond to discovery requests). I have no real record to evaluate in ascertaining why JCI did not demand arbitration during the period from December 2000, until the complaint was filed. Presumably, the parties were engaged in negotiations as contemplated by the contract and supported by the Siviski and Rossignol affidavits. I do find that based on record events since the complaint was filed there has not been a waiver by JCI.

### Conclusion

I recommend that the Court **GRANT** JCI's motion to stay the present action and to compel arbitration.

### *NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

---

4. The Superintendent of MSAD 68, Donald Siviski, reports that they were in negotiations with JCI from the time the asbestos release was discovered. (Siviski Aff. ¶ 9.) Apparently, MSAD 68 attempted to obtain a settlement with JCI, but JCI was not interested in moving forward in negotiations until obtaining

certain information from MSAD 68 regarding its claims. (Rossignol Aff. ¶¶ 5, 10.) According to JCI, the information was not provided and the parties remained in a standstill until MSAD 68 filed the present complaint. (*Id.* ¶ 11.)

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

July 30, 2002.