Gregory W. JOHNSON, et al., Plaintiffs

v.

POLARIS SALES, INC.,
et al., Defendants

No. 02–CV–185–B–S.

United States District Court,
D. Maine.

April 4, 2003.

Daniel J. Bernier, Phillips & Bernier LLC, Waterville, ME, for Plaintiffs.

Timothy C. Woodcock, Weatherbee, Woodcock, Burlock & Woodcock, Bangor, ME, for Defendants.

## ORDER

SINGAL, Chief Judge.

A dealer of all terrain vehicles ("ATVs"), snowmobiles and watercraft sued the manufacturer and distributor of those products to recover damages resulting from alleged misrepresentations and various equitable and contractual harms. Presently before the Court is Defendants' Combined Motion to Dismiss and to Compel Arbitration (Docket # 5). For the following reasons, the Court GRANTS Defendants' Motion.

## I. BACKGROUND

Plaintiff Johnson Marine & Rec., Inc. ("Johnson Marine"), formerly known as Johnson's Power, Inc., is a Maine corporation with its principal place of business in Pembroke, Maine. Plaintiffs Kimberly[1] and Gregory Johnson are the owners and operators of Johnson Marine. Defendant Polaris Industries, Inc. ("Polaris Industries"), a Minnesota corporation with its principal place of business in Minneapolis,

---

1. Although the complaint styles Plaintiff's name as "Kimberly Johnson," her actual name is "Bobbie–Kim Johnson." Consistent with Plaintiffs' motion pointing out this oversight, the Court uses the appellation "Kim Johnson" to refer to the named party "Kimberly Johnson."

Minnesota, manufactures personal sporting craft. Defendant Polaris Sales, Inc. ("Polaris Sales"), also a Minnesota Corporation with its principal place of business in Minneapolis, Minnesota, markets and distributes Polaris products.

Beginning in the early 1990's, Johnson Marine and Polaris Industries entered into a series of annual agreements authorizing Plaintiffs to sell Polaris products. The parties last contracted for the period spanning April 1, 1998 to March 31, 1999 ("Dealer Agreement" or "Agreement"). Under the terms of the 1998–1999 Dealer Agreement, Polaris Industries agreed to sell Polaris snowmobiles, ATVs and watercraft along with related parts, accessories, oil and clothing to Johnson Marine. Johnson Marine, in turn, agreed to purchase Polaris products and sell them to consumers subject to numerous additional obligations, including warranty and servicing provisions, financing arrangements and advertising requirements. Also included in the Dealer Agreement was an arbitration clause.[2] Although the Agreement expired by its terms on March 31, 1999, Plaintiffs continued to sell products on behalf of Polaris Industries until September of 2000.

Sometime in 1998 Johnson Marine's business began to decline. In light of Pembroke's proximity to the Canadian border, Plaintiffs contend that Johnson Marine sales suffered because Canadian dealers sold Polaris products to American customers at Canadian prices. According to Plaintiffs, Defendants made a number of representations between November 1998 and April 2000 that they would not permit the cross-border sales to continue. Defendants allegedly sought to curb this practice by fining Canadian dealers who sold to American consumers and paying a portion of this money to American dealers who reported the unauthorized sales. Plaintiffs contend that Johnson Marine purchased additional Polaris products in reliance upon these representations and was ultimately driven out of business when sales continued to decline due to unchecked cross-border competition.

As a result of these events, Plaintiffs brought suit in Superior Court for Washington County on October 8, 2002, alleging various contractual, equitable, statutory and common law tort claims against Defendants. Defendants removed the action to this Court on November 27, 2002 pursuant to 28 U.S.C. § 1441 (1994) (Docket # 1). Defendants presently seek to compel arbitration on all of Plaintiffs' claims and dismiss or, alternatively, stay the action pending arbitration pursuant to the terms of the Dealer Agreement (Docket # 5).

## II.  DISCUSSION

■ The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, embodies a

---

**2.** The arbitration clause states in pertinent part:

All disputes, controversies, and claims arising out of or in connection with the execution, interpretation, performance, nonperformance, or breach (including without limitation the validity, scope, enforceability, and voidability under any statute, regulation, ordinance, or ruling), or termination or nonrenewal of this Agreement, or of any provision of this Agreement (including without limitation this arbitration provision and the arbitrability of any issue), or arising out of or in connection with any claimed duty, right, or remedy (whether arising under this Agreement or any statute, regulation, ordinance, or rule of law or otherwise) relating to any of the foregoing, shall be solely and finally settled by arbitration at Minneapolis, Minnesota, in accordance with the United States Arbitration Act (9 U.S.C. 1 *et. seq.*), and the rules of the American Arbitration Association relating to commercial arbitration.

Agt. at § 19(A).

"strong policy in favor of rigorously enforcing arbitration agreements." *KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 49 (1st Cir.1999) (citing *Perry v. Thomas*, 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)). Section 4 of the Act provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement."[3] 9 U.S.C. § 4 (1999). Arbitration remains a matter of contract, however, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, ——, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)) (internal quotations omitted).

    "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for the court to decide." *Howsam*, 537 U.S. at ——, 123 S.Ct. at 592. Thus, a court must decide all questions of "arbitrability" before the parties can proceed to arbitration of the underlying dispute. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). However, judicial determination of arbitrability may be circumvented through contract. *First Options*, 514 U.S. at 949, 115 S.Ct. 1920; *AT & T*, 475 U.S. at 649, 106 S.Ct. 1415. If the contracting parties provide clear and unmistakable evidence of an intent to arbitrate arbitrability, such threshold determinations are removed from the province of the court. *First Options*, 514 U.S. at 949, 115 S.Ct. 1920; *AT & T*, 475 U.S. at 649, 106 S.Ct. 1415. Courts apply state law principles of contract formation when determining whether the parties are bound by an arbitration clause. *First Options*, 514 U.S. at 944, 115 S.Ct. 1920; *Sleeper Farms v. Agway, Inc.*, 211 F.Supp.2d 197, 200 (D.Me.2002). Here, the parties have specified that Minnesota law governs the interpretation of the Dealer Agreement.[4] *See* Agt. at § 20(D).

    Arbitrability questions are generally of two types. An arbitrability issue arises where the parties to a contract dispute the existence of a valid arbitration agreement or the substantive scope of that agreement. *See Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 624 (6th Cir.

---

**3.** The FAA is applicable in the present case because the Agreement involved "commerce among the several states." 9 U.S.C. §§ 1, 2 (1999); *see also Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

**4.** Choice of law principles represent substantive law, to be borrowed from the forum state by a federal court sitting in diversity jurisdiction. *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir.1991). Because Defendants removed to this Court on the basis of diversity jurisdiction, Maine law applies. Maine courts will enforce a contractual choice of law provision unless the chosen state lacks a substantial relationship to the parties or application of foreign law would be contrary to a fundamental Maine policy. *Mitsubishi Caterpillar Forklift of Am., Inc. v. Superior Serv. Assocs., Inc.*, 81 F.Supp.2d 101, 118 (D.Me.1999) (quoting *Schroeder v. Rynel. Ltd.* 720 A.2d 1164, 1166 (Me.1998)). Under Maine law, a substantial relationship exists between Minnesota and the parties because both Defendants are incorporated in Minnesota. *Schroeder*, 720 A.2d at 1166. Thus, Minnesota law governs any construction of the Dealer Agreement necessary to make a threshold determination of arbitrability.

2003); *Me. Sch. Admin. Dist. Number 68 v. Johnson Controls, Inc.,* 222 F.Supp.2d 50, 53 (D.Me.2002). In the present case the parties dispute both the existence of the Dealer Agreement and whether the Canadian dealer dispute falls within the reach of the Agreement's arbitration clause. Thus, the Court must resolve two arbitrability questions before compelling arbitration under Section 4:(1) whether a valid arbitration agreement exists; and (2) whether the parties have agreed to arbitrate the present dispute.

## A. Existence of an Arbitration Agreement

Plaintiffs maintain that Gregory and Kim Johnson did not sign the Dealer Agreement and thus cannot be bound by its terms. Additionally, they assert that Defendant Polaris Sales is not a signatory to the Agreement. Thus, Plaintiffs contest the viability or existence of an agreement to arbitrate as between Defendant Polaris Sales and all Plaintiffs and as between Defendants and Gregory and Kim Johnson.[5] The existence of a written agreement to arbitrate between the parties is a prerequisite to the compulsion of arbitration under the FAA.[6] 9 U.S.C. § 4 (1999); *MCI Telecomms. Corp. v. Exalon Indus.,*

*Inc.,* 138 F.3d 426, 429–30 (1st Cir.1998); *Sleeper Farms,* 211 F.Supp.2d at 200. Accordingly, the Court must first address the merits of Plaintiffs' nonsignatory arguments before considering the scope of the Dealer Agreement arbitration clause.

Although the FAA requires a preexisting agreement to arbitrate, the Act does not require that every party personally sign the written arbitration provision. *McCarthy v. Azure,* 22 F.3d 351, 355–56 (1st Cir.1994). Nonsignatories may be obligated by or benefit from arbitration agreements signed by others under principles of contract or agency law. *Id.* at 356. In the instant case, two theories of equitable estoppel are relevant to determining whether the nonsignatory parties are bound by the Agreement. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 199 (3d Cir.2001) (discussing two theories of equitable estoppel); *Mag Portfolio Consult, Gmbh v. Merlin Biomed Group Llc,* 268 F.3d 58, 61–62 (2d Cir. 2001) (same).

The first theory addresses Defendant Polaris Sales' nonsignatory status. "[A] court will 'estop a *signatory* from avoiding arbitration with a nonsigna-

---

**5.** Because arbitration clauses are severable from the contracts in which they occur, only challenges to the substance of the clause itself or the very existence of the larger contract constitute arbitrability questions for the court. *Large v. Conseco Fin. Servicing Corp.,* 292 F.3d 49, 53 (1st Cir.2002) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)); *Sleeper Farms v. Agway, Inc.,* 211 F.Supp.2d 197, 201 (D.Me.2002). Where the challenge asserts that an agreement no longer exists but acknowledges that an arbitration agreement once existed between the parties as to the dispute, the dispute does not pose a question of arbitrability. *Large,* 292 F.3d at 53–54; *A.T. Cross Co. v. Royal Selangor PTE, Ltd.,* 217 F.Supp.2d 229, 233 (D.R.I.2002).

In the present case, Plaintiffs concede the existence of a written agreement to arbitrate with respect to the signatory parties but contest that an agreement ever existed as to the nonsignatory parties in addition to disputing the scope of the agreement. Thus, Plaintiffs' nonsignatory arguments go to the very existence of an agreement to arbitrate. *See Sandvik AB v. Advent Int'l Corp.,* 220 F.3d 99, 106 (3d Cir.2000); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 95 (2d Cir.1999).

**6.** Section 4 of the Act permits a court to compel arbitration only "upon being satisfied that the making of the agreement for arbitration ... is not in issue." 9 U.S.C. § 4 (1999).

tory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed,' and the signatory and nonsignatory parties share a close relationship." [7] *MAG Portfolio,* 268 F.3d at 62 (citing *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995)); *see also Choctaw Generation L.P. v. Am. Home Assurance Co.,* 271 F.3d 403, 406 (2d Cir.2001). Here, the Court considers Polaris Sales' close affiliation with the signatory Defendant, Polaris Industries, Polaris Sales' marketing and sales relationship with the signatory Plaintiff under the terms of the Dealer Agreement as well as the inseparable nature of the allegations directed at Defendants. In light of these facts, the Court finds that Polaris Sales may seek to compel arbitration of signatory Johnson Marine despite its nonsignatory status. *See Simitar Entm't, Inc. v. Silva–Simitar Entm't, Inc.,* 44 F.Supp.2d 986, 993 n. 5 (D.Minn.1999) (finding a nonsignatory entitled to compel arbitration).

▬▬▬ The second theory is relevant to signatory Polaris Industries' efforts to compel nonsignatories Gregory and Kim Johnson to arbitrate. Courts will enforce arbitration against a nonsignatory to an arbitration agreement on behalf of a signatory, provided the nonsignatory knowingly accepted benefits flowing directly from the agreement. *MAG Portfolio,* 268 F.3d at 61. "[T]he doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen, GMBH,* 206 F.3d 411, 418 (4th Cir.2000). Such cases generally involve nonsignatories that exploit the benefits of a contract prior to litigation, but subsequently seek to repudiate the arbitration clause contained within the contract. *E.I. DuPont,* 269 F.3d at 200.

Here, Plaintiffs knowingly operated under and benefited from various dealer agreements, including the 1998–1999 Agreement. As owners of Johnson Marine, Gregory and Kim Johnson operated as authorized Polaris dealers "at least as far back as the early 1990s." (Compl. at ¶¶ 8–9 (Docket # 1).) Plaintiffs continued to sell Polaris products in that capacity until September of 2000. (*See* Aff. of Bobbie–Kim Johnson at ¶¶ 2–3 (Docket # 7).) Indeed, Plaintiffs' claims rest largely on damages sustained as a result of stocking additional Polaris products in reliance upon representations allegedly made by Defendants. (*See* Compl. at ¶¶ 11–13 (Docket # 1).) The Dealer Agreement is explicit that such purchases are to be made from Polaris under the terms of the contract. *See* Agt. at § 2(A).[8] Thus, not only have Gregory and Kim Johnson enjoyed the direct contractual benefit of purchasing Polaris products during the life of the Dealer Agreement, they have also based their present action in part upon those benefits. The Court finds that the nonsignatory Plaintiffs are estopped from

---

**7.** As Plaintiffs acknowledge that "Johnson's Power, Inc." is the corporate predecessor to signatory "Johnson Marine & Rec., Inc.," the Court does not address the nonsignatory status of Johnson's Power and treats both entities as signatories to the Dealer Agreement. (*See* Plts.' Opp. to Defs.' Mot. to Dismiss at 1 (Docket # 6).)

**8.** Section 2 of the Agreement, "Purchase of Products by Dealer," provides in subsection (A) that "Polaris will sell products and may sell other items to Dealer subject to availability and the terms of this Agreement." Agt. at § 2(A).

denying the existence of the Dealer Agreement.

### B. Scope of the Arbitration Agreement

The Court is also currently presented with a gateway or threshold dispute regarding the applicability of the Dealer Agreement arbitration clause. Plaintiffs first argue that the Canadian dealer dispute is not within the scope of the arbitration clause because it does not relate to the termination of the Agreement nor otherwise appear in the contract. They next assert the existence of a separate collateral agreement to pay Canadian fine money formed after the expiration of the 1998–1999 Dealer Agreement. Defendants respond that the dispute arises out of the termination of the Agreement and thus falls within the scope of the arbitration clause. Because the parties dispute the reach of the arbitration agreement, the Court must address the scope controversy unless the agreement provides clear and unmistakable evidence of a contrary intent.

### 1. Intent to Arbitrate Arbitrability

Here, the Dealer Agreement requires that "[a]ll disputes, controversies and claims arising out of or in connection with the ... interpretation ... of this Agreement, or of any provision of this Agreement (including without limitation this arbitration provision and the arbitrability of any issue) ... shall be solely and finally settled by arbitration...." Agt. at § 19(A). Under Minnesota law, contractual language is given its plain and ordinary meaning. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn.1998). The ordinary meaning of the language included by the parties indicates that they were aware of and focused on "the significance of having arbitrators decide the scope of their own powers." *First Options*, 514 U.S. at 945, 115 S.Ct. 1920.

The clause broadly encompasses "all disputes, controversies or claims arising out of or in connection with ... any provision of this Agreement." Agt. at § 19(A); *see also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir.1996) (noting that an express agreement providing for the arbitration of "any and all" disputes represented clear and unmistakable evidence of an intent to arbitrate arbitrability). On its face, the plain language of the Agreement indicates that the arbitrator should decide the sweep of the arbitration clause. *Brookfield Trade Ctr.*, 584 N.W.2d at 394.

Courts should construe contract terms in the context of the entire agreement and interpret them so as to effectuate the intent of the parties and give meaning to all provisions. *S O Designs USA, Inc. v. Rollerblade, Inc.*, 620 N.W.2d 48, 53 (Minn.Ct.App.2000). In the instant case, the Dealer Agreement specifically anticipates arbitration of both arbitrability disputes generally and controversies regarding interpretation more specifically. *See McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P.*, 105 F.3d 1192, 1193–94 (8th Cir.1997) (requiring inclusion of "arbitrability" language in an arbitration clause before finding clear and unmistakable evidence). The use of the mandatory "shall" further dispels any uncertainty attaching to the parties' intent. *See Telectronics Pacing Sys., Inc. v. Guidant Corp.*, 143 F.3d 428, 431 (8th Cir.1998) (emphasizing the use of mandatory language when examining an arbitration agreement for clear and unmistakable evidence). Because the plain language of the provision clearly evinces an intent to arbitrate arbitrability, the Court does not address the scope of the clause.

Additionally, the parties further demonstrated their intent to allow the arbitrator to decide her own jurisdiction by incorporating the rules of the American Arbitra-

tion Association. Under Rule 8, the arbitrator "shall have the power to rule on his or her own jurisdiction including any objection with respect to ... scope ... of the arbitration agreement." Courts have consistently drawn on arbitral rules incorporated into an arbitration agreement by reference as a demonstration of the intent of the contracting parties. *See, e.g., Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir.2003) (applying International Chamber of Commerce arbitral rules); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir.1989) (same); *Sleeper Farms* 211 F.Supp.2d at 200 (applying Rule 8 of the American Arbitration Association rules); *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.R.D. 677, 684 (S.D.Fla.2001) (same). As such, the Court finds a clear and unmistakable intent on the part of the parties to submit questions regarding the scope of the Dealer Agreement arbitration clause to the arbitrator.

**2. Expiration of the Dealer Agreement**

■ Plaintiffs also argue that the Dealer Agreement expired by its terms on March 31, 1999, thereby ending the contractual relationship between the parties.[9] Accordingly, Plaintiffs maintain that the Canadian fine money controversy is not subject to the arbitration clause but instead represents an entirely separate agreement that arose after the expiration of the Dealer Agreement. Defendants respond that this position is belied by Plaintiffs' complaint. They argue that the complaint alleges an oral agreement regarding fine money arising during the course of the Dealer Agreement. Additionally, Defen-

dants maintain that to the extent the dispute falls within the scope of the arbitration clause, the clause survives termination or nonrenewal of the Agreement by its terms.

■ The Dealer Agreement reflects an intention to make the arbitration clause survive its termination. Rights asserted after the expiration of a contract may still attach where "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton Fin. Printing Div., Inc. v. NLRB*, 501 U.S. 190, 206, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *see also Me. Sch. Admin. Dist. Number 68 v. Johnson Controls, Inc.*, 222 F.Supp.2d 50, 53 (D.Me.2002). Under Minnesota law, a contractual provision survives the expiration of an underlying agreement where the provision includes specific language to that effect. *See Burke v. Fine*, 608 N.W.2d 909, 912 (Minn.Ct. App.2000) (finding that noncompete provision did not survive expiration of underlying contract absent specific language to the contrary).

In the present case, the Dealer Agreement provides that upon termination or nonrenewal, Johnson Marine "shall nevertheless remain obligated under the provisions of this Agreement which by their express terms or by implication survive termination or nonrenewal." Agt. at § 13(C). The section of the Agreement entitled "Arbitration" includes such express survival language. "This Section 20 shall survive termination or nonrenewal of this Agreement by either party for any reason."[10] Agt. at § 19(E). Consequent-

---

**9.** Plaintiffs appear to qualify this argument by conceding the possibility that the Dealer Agreement may have been renewed. (*See* Aff. of Bobbie–Kim Johnson at ¶¶ 2–3 (Docket # 7).) The Court assumes for the purposes of

the present inquiry that no such agreement to renew exists.

**10.** The survival provision is not located within Section 20, "Miscellaneous," of the Dealer Agreement as the provision indicates, but

ly, the arbitration clause remains in effect to the extent that the cross-border sales dispute falls within its scope. As discussed above, this scope determination has been firmly committed to arbitration by the parties. Because the Court agrees that the clause survives expiration of the Agreement, it does not consider the parties' collateral agreement arguments and finds that the expiration dispute is also for the arbitrator.

## III. CONCLUSION

For the foregoing reasons the Court GRANTS Defendants' Motion to Compel Arbitration and STAYS all proceedings before the Court pending the outcome of arbitration in this matter. The Court further ORDERS that the parties promptly submit this matter to arbitration, proceed with said arbitration in good faith and report back to the Court upon the completion of arbitration or the passage of six months (6) from the date of this order, whichever occurs first.[11]

SO ORDERED.

---

rather within Section 19, "Arbitration." The parties' use of the general term *"section "* in the arbitration provision, when contrasted with the more particular survival language already included within subsection (D) of Section 20 ("This *provision* shall survive the termination or nonrenewal of this Agreement by any party for any reason."), convinces the Court that the reference to Section 20 should be interpreted as a reference to Section 19. *See S O Designs USA, Inc. v. Rollerblade, Inc.,* 620 N.W.2d 48, 53 (Minn.Ct.App.2000) (requiring that contracts be interpreted as a whole).

**11.** Defendants ask the Court to dismiss the matter or, alternatively, stay the proceeding pending arbitration. The Court stays the action rather than dismiss the case because the Court retains diversity jurisdiction over any post-arbitration proceedings necessary to resolve Plaintiffs' state law claims should the arbitrator find the claims outside the scope of the arbitration clause. *See* 9 U.S.C. § 3 (1999); *Cannavo v. Enter. Messaging Servs., Inc.,* 982 F.Supp. 54, 60 (D.Mass.1997) (staying arbitration for thirty days in the apparent absence of demand for arbitration where the court retained jurisdiction over nonarbitrable claims).