**SLEEPER FARMS, et al., Plaintiffs,**

v.

**AGWAY, INC., et al., Defendants.**

**No. 02–CV–35–B–S.**

United States District Court,
D. Maine.

July 1, 2002.

Daniel G. Lilley, Christian C. Foster, Esq., Daniel G. Lilley Law Offices, P.A., Portland, ME, for plaintiffs.

Frederick J. Badger, Jr., Richardson, Whitman, Large & Badger, Bangor, Maine, for defendants.

## ORDER

SINGAL, District Judge.

A potato grower sued an agricultural cooperative and several of its employees to recover monies allegedly owed under potato purchase contracts. Presently before the Court are Plaintiffs' Motion to Stay/Enjoin Arbitration (Docket # 5) and Defendants' Motion to Dismiss or to Stay Proceedings Pending Arbitration (Docket # 7). Pursuant to the following discussion, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion.

## I. BACKGROUND

Plaintiff Sleeper Farms is a potato farm located in Sherman Mills, Maine. Plaintiffs Vaughn and Mary Sleeper own and operate Sleeper Farms, which they purchased from Vaughn Sleeper's father in May 1998. Defendant Agway is a Delaware corporation specializing in agricultural goods and services, with its principal place of business in Dewitt, New York. Defendants Richard Sirois, Todd Bradley and Carl Smith are Agway employees.

From 1998 through 2000, Sleeper Farms was a "contract grower" of seed potatoes for Agway. Early each season, Vaughn Sleeper spoke with either Sirois or Bradley, Agway sales representatives, and agreed to plant certain quantities and vari-

eties of seed potato in return for Agway's promise to buy the crop at harvest time. The parties discussed price only rarely, normally leaving the price term open. When Sleeper harvested the potatoes, Agway sent purchase orders signed by a sales representative for specific quantities at specific prices. Sleeper signed and returned the orders, and shipped the potatoes to growers Agway designated. The growers inspected the potatoes and reported to Agway on their quality. Agway then paid Sleeper for the potatoes shipped.

Sleeper received, signed and returned eight purchase orders from Agway between 1998 and 2000. Each order arrived by mail, usually with an enclosure labeled "Agway Sales Contract." The enclosure described various terms and conditions of sale between parties designated "Buyer" and "Seller," and contained an arbitration provision that read:

> The parties to this Contract agree that the sole remedy for resolution of any and all disagreements or disputes arising under this Contract shall be through arbitration in accordance with the rules of the American Arbitration Association, Syracuse, New York. The decision and award determined through such arbitration shall be final and binding upon the buyer and seller. Judgment upon the arbitration award may be entered and enforced in any Court having jurisdiction thereof.

At an evidentiary hearing held May 15, 2002, Vaughn Sleeper testified that he does not remember receiving the enclosure with some of the purchase orders he signed and returned, but acknowledged that he was familiar with the document and that he had numerous copies of it at his home. Both parties indicated, moreover, that they understood the Agway Sales Contract to be the document referred to on the purchase orders as the "attached terms and conditions" to which signatories to the purchase orders assented.

Although Sleeper acknowledges signing the purchase orders and returning them to Agway, it contends that the orders did not fulfill the underlying agreement between the parties for each season. Potatoes that Sleeper had planted at the outset of the growing season, on Agway's promise to purchase them, remained unsold after each season's harvest and spoiled. Sleeper also contends that it did not receive agreed-upon prices for some of the potatoes it did sell to Agway, and that it only signed the orders designating the prices because it did not have a choice. Often, the purchase orders arrived after negotiation had begun for the subsequent growing season, effectively forcing Sleeper to accept unfavorable prices in exchange for continued patronage from Agway. Sleeper also claims that on several occasions, Agway did not pay for potatoes the farm shipped.

In June 2000, Agway withheld payment from Sleeper for shipments of potatoes it claims were not satisfactory. Sleeper protested, and Agway eventually filed a demand for arbitration with the American Arbitration Association. Sleeper responded by filing the suit at bar, alleging a variety of contractual, statutory and common law tort claims against Defendants. Sleeper also immediately moved to stay or enjoin the arbitration (Docket # 5). Agway and the individual Defendants moved to dismiss or to stay the district court proceedings pending arbitration (Docket # 7).

## II. DISCUSSION

The parties' cross-motions in this case require the Court to resolve the seemingly elementary issue of whether Plaintiffs' claims can be arbitrated. The issue implicates two questions: (1) Did the parties

enter into an agreement to arbitrate? and (2) If so, did they agree to arbitrate claims such as the ones Plaintiffs raise? The first question addresses the existence of the agreement, whereas the second involves its "scope." Together, these questions are referred to as whether Plaintiffs' claims are "arbitrable." *See PaineWebber Inc. v. Elahi,* 87 F.3d 589, 595 (1st Cir.1996) (discussing "arbitrability").

The Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA" or the "Act"), which governs the procedure for submitting disputes to arbitration, guides the Court in resolving "arbitrability" questions.[1] The Act emphasizes that arbitration is fundamentally a contractual matter, and requires courts to honor all agreements to arbitrate except those that are invalid "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The existence of an agreement to arbitrate is paramount. "It is a cardinal principle of federal arbitration law that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Stinson v. America's Home Place, Inc.,* 108 F.Supp.2d 1278, 1281 (M.D.Ala.2000) (quoting *AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); *see also Elahi,* 87 F.3d at 593 (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)); 9 U.S.C. § 4 (requiring the court to compel arbitration provided that "the making of

[an] agreement [to arbitrate] ... is not in issue").

■ Once the existence of an agreement is established, courts turn to the question of the "scope" of the arbitration agreement, *unless* the parties have "clearly and unmistakeably" delegated the issue of "scope" to an arbitrator. *AT & T Tech., Inc.,* 475 U.S. at 649, 106 S.Ct. 1415; *see also First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Carson v. Giant Food, Inc.,* 175 F.3d 325, 329 (4th Cir.1999); *General Motors Corp. v. Pamela Equities Corp.,* 146 F.3d 242, 248–49 (5th Cir.1998). In this case, the arbitration clause provides that arbitration shall proceed according to the rules of the American Arbitration Association. Rule 8 of those rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the ... scope ... of the arbitration agreement." *See* Aff. of Adams, ex. B (Docket # 4). This is a "clear and unmistakable" delegation of scope-determining authority to an arbitrator. *See Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.,* 203 F.R.D. 677, 685 (S.D.Fla.2001). Thus, if the Court finds that an agreement to arbitrate exists between the parties, it will leave the second arbitrability question to an arbitrator.

### A. Existence and Validity of Agreement to Arbitrate

■ In deciding whether Plaintiffs and Defendants agreed to arbitrate their dis-

---

1. The Act is applicable to this case because the transactions between the parties involved "commerce." The Act defines "commerce," in pertinent part, as "commerce among the several States." 9 U.S.C. § 1. Although the contracts at issue in this case were for the purchase and sale of potatoes entirely within Maine, the Act has been interpreted to apply to all contracts "relating to interstate commerce," as those at issue in this case undoubtedly did. *See Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 268, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (finding that the FAA reaches "to the limits of Congress' Commerce Clause power").

putes, the Court applies state law principles of contract formation. *See First Options*, 514 U.S at 944, 115 S.Ct. 1920. Plaintiffs argue that they never assented to the purchase orders, and even if they did, the purchase orders do not incorporate an arbitration clause. Moreover, they contend that even if the arbitration clause is incorporated into the purchase orders, it is unconscionable or fraudulently induced. Finally, they argue that the purchase orders, themselves, are illegal, unconscionable or fraudulently induced.

Only some of these arguments challenge the existence of the agreement to arbitrate, however. In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Supreme Court distinguished between challenges to the *validity* of the contract as a whole, and challenges to the *existence* of the agreement to arbitrate. *Id.* at 403–04, 87 S.Ct. 1801; *see also Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159 (5th Cir.1987) (alleged illegality of contract goes to its validity); *Stinson*, 108 F.Supp.2d at 1282–83 (collecting cases). The rationale behind *Prima Paint* is that "an arbitration clause is severable from the contract in which it is embedded." *Large v. Conseco Finance Servicing Corp.*, 292 F.3d 49, 53 (1st Cir.2002) (pagination not yet available). Because it is severable, only challenges to the substance of the clause itself, or to the existence of the contract within which it appears, are pertinent to the issue of the existence of an agreement to arbitrate. *Id.* at 53 (citing *Three Valleys Municipal Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136,

1137–42 (9th Cir.1991); *Stinson*, 108 F.Supp.2d at 1282–83).

Applying this distinction, the Court finds that Plaintiffs' arguments that they did not assent to the purchase orders, that the purchase orders did not incorporate the arbitration clause contained in the so-called "Agway Sales Contract," and that the arbitration clause was unconscionable or fraudulently induced, go to the agreement to arbitrate's existence. By contrast, the arguments that the purchase orders were illegal, unconscionable or fraudulently induced only challenge the validity of the contract as a whole. The Court will only address the former arguments in resolving the first arbitrability question.[2]

1. Did the parties express their mutual assent to the purchase orders?

█ Plaintiffs contend that they never assented to the purchase orders, and therefore that they are not bound by them. The Court finds this argument to be frivolous. The purchase orders, on their face, are contracts for the sale of seed potatoes. Both parties acknowledge signing them and acting in accordance with them. Indeed, several of Plaintiffs' claims arise from Defendants' alleged breach of the obligations described in the purchase orders. In short, there is little doubt that the orders are contracts for the sale of seed potatoes, to which both parties assented. *See VanVoorhees v. Dodge*, 679 A.2d 1077, 1080 (Me.1996) ("To establish a legally binding agreement the parties must have mutually assented to be bound by all its material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be

---

**2.** The question of whether the latter issues should be decided by an arbitrator or the Court implicates the arbitration clause's scope. *Compare Tracer Research Corp. v. Nat. Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir.1994) (citing *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458 (9th Cir. 1983); *with Battaglia v. McKendry*, 233 F.3d 720, 726 (3d Cir.2000) (rejecting *Tracer*); *H.S. Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 385 (11th Cir.1996)); *see also McCarthy v. Azure*, 22 F.3d 351 (1st Cir.1994).

sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties").

2. Did the purchase orders incorporate the "Agway Sales Contract" by reference?

Plaintiffs argue, however, that even if they assented to the purchase orders, the "Agway Sales Contract" containing the arbitration provision was never validly incorporated into the purchase orders, and therefore an agreement to arbitrate never came into being. They point out that the document was not attached to the purchase orders, that they did not sign it, and that its terms did not reflect the actual relationship between the parties. These arguments are without merit. Whether or not the document was physically attached to the purchase orders is irrelevant. Documents extrinsic to a written contract may be incorporated into it by reference. *See, e.g., Bradstreet v. Rich*, 74 Me. 303, 1883 WL 3330 (1883) ("When a contract has reference to another paper for its terms, the effect is the same as if the words of the paper referred to were inserted in the contract.") Even if a document referred to in the contract as "attached" is not physically appended to it, the document is nevertheless treated as incorporated provided it is readily available to the contracting parties. *See, e.g., Beedy v. San Mateo Hotel Co.*, 27 Cal.App. 653, 150 P. 810 (1915) (cited in 17A Am.Jur.2d Contracts § 400 (1991)). That was unquestionably the case here. Plaintiffs acknowledged that they understood the "Agway Sales Contract" to be the "terms and conditions" referred to in the purchase orders, and possessed at least five copies of the document. There could be no mistake that the purchase orders incorporated those terms and conditions. As such, Plaintiffs' signature on the Agway Sales Contract was unnecessary.

Plaintiffs next argue that the provisions of the Agway Sales Contract are unenforceable because they refer to a "Buyer" and "Seller," whereas Defendant Agway acted essentially as a broker, rather than a buyer, in its transactions with Plaintiffs. Plaintiffs reason that this purported mismatch in terms renders the Agway Sales Contract's provisions meaningless. To bolster their argument, Plaintiffs elicited from Defendant Sirois at hearing an admission that Defendant Agway acted as a seed potato "broker," insofar as its business was to purchase seed potatoes from Plaintiffs and, for the most part, sell them to other seed potato growers.

However, the purchase order refers to the parties as "Seller" (meaning Plaintiffs) and "Buyer" (meaning Defendant Agway). The Agway Sales Contract uses the same terms. Plaintiffs introduced no evidence at hearing suggesting they believed Defendant Agway was anything other than the "Buyer" referred to in the purchase order. Moreover, although Defendant Sirois acknowledged he perceived Defendant Agway's role as that of a "broker," he defined the term as one who purchases from one party and sells to another. In short, the terms "broker" and "buyer" do not appear to be mutually exclusive in this context, and in any case, there was no ambiguity at the time of contracting about who the parties referred to in the Agway Sales Contract actually were. The Agway Sales Contract and the arbitration provision it contained were incorporated by reference into the purchase order contracts.

3. Is the arbitration provision invalid?

 Plaintiffs also purport to mount two challenges to the validity of the arbitration clause itself, arguing that it is either unconscionable or fraudulently in-

duced. A clause in a sales contract is unconscionable when:

> in light of the general commercial background and the commercial needs of the particular trade or case, the [clause] involved [is] so one-sided as to be unconscionable under the circumstances existing at the time of the contract ... The principle is one of the prevention of oppression and unfair surprise, and not of disturbance of allocation of risks because of superior bargaining power.

11 M.R.S.A. § 2–302, cmt. 1. Plaintiffs argue that the arbitration clause, itself, is "one-sided." There is little in the clause that supports Plaintiffs' argument. That Plaintiffs may be required to arbitrate their dispute out-of-state is not unconscionable. *Cf. DiMercurio v. Sphere Drake Ins. PLC*, 202 F.3d 71, 81 (1st Cir.2000) (arbitration clause in insurance contract requiring that all coverage disputes be arbitrated in London, England, not unconscionable). Although it is possible that arbitration fees may be so burdensome as to prevent Plaintiffs from vindicating their rights, it is Plaintiffs' burden to show that arbitration would be "prohibitively expensive." *Green Tree Fin. Corp.—Alabama v. Randolph*, 531 U.S. 79, 92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). Plaintiffs have failed to do so, and in fact it appears that fees in this case have been waived by the arbitrator. *See* Plaintiffs' Brief, exh. 1 (Docket # 23). Finally, the fact that arbitration effectively entails the forfeiture of Plaintiffs' Seventh Amendment right to a trial by jury does not render the clause unconscionable. *See Snowden v. Check-Point Check Cashing*, 290 F.3d 631, 638 (4th Cir.2002) (pagination not yet available); *Burden v. Check into Cash of Kentucky, LLC*, 267 F.3d 483, 492 (6th Cir. 2001). Although Plaintiffs attempted to show at an evidentiary hearing held May 15, 2002, that the clause is unconscionable, the evidence showed nothing more than their dissatisfaction with Defendants' bargaining position in negotiating the purchase orders as a whole. This issue goes to the validity of the contract rather than the existence of an agreement to arbitrate, and is for the arbitrator, not the Court, to decide. *See Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. 1801; *Stinson*, 108 F.Supp.2d at 1282–83.

■ Finally, Plaintiffs argue that Defendants fraudulently induced them to agree to the purchase orders by promising to purchase and pay for future installments of seed potatoes. Like Plaintiffs' argument regarding unconscionability, however, these arguments do not address the arbitration provision specifically, and are appropriate for an arbitrator. Plaintiffs do not argue that Defendants made specific representations regarding the arbitration provision, itself, that induced them to agree to the purchase orders. *See Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. 1801; *Stinson*, 108 F.Supp.2d at 1282–83.

### B. Remaining Issues

Satisfied that the parties entered into an agreement to arbitrate, the Court refers this dispute to an arbitrator to determine: (1) what issues contained in Plaintiffs' Complaint, or raised by Plaintiffs as defenses to the purchase orders, are covered by the arbitration clause; (2) what issues, if any, are not covered by the clause and should remain for the Court to decide; and (3) the merits of the issues that are covered by the clause. The Court will stay its proceedings pending the resolution of those issues. *See, e.g., Elahi*, 87 F.3d at 595.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' Motion to Stay/Enjoin Arbitration. The Court further GRANTS

Defendants' Motion to Dismiss/Stay Proceedings and STAYS proceedings before the Court pending arbitration as described above.

SO ORDERED.