Opinion issued August 16, 2007




 



 












In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00485-CV

__________


BURLINGTON RESOURCES OIL & GAS COMPANY LP, Appellant


V.


SAN JUAN BASIN ROYALTY TRUST, Appellee






On Appeal from the 281st District Court

Harris County, Texas

Trial Court Cause No. 2005-74370






O P I N I O N

 Appellant, Burlington Resources Oil & Gas Company LP ("Burlington"),
challenges the trial court's judgment rendered in favor of appellee, San Juan Basin
Royalty Trust (the "Trust"), confirming a portion of an arbitration award in favor of
the Trust and ordering that the Trust recover from Burlington damages in the amount
of $6,019,370, plus interest, for a total disputed award of $6,243,990. In its first
issue, Burlington contends that the parties did not agree, by clear and unmistakable
language, to submit questions regarding the scope of arbitrable issues to the
arbitrator. In its second issue, Burlington contends that "construing the scope of the
arbitration agreement de novo," the parties' dispute is not within the scope of the
arbitration agreement. 

 We reverse and render in part and remand in part.

Factual and Procedural Background


 Burlington (1) owns and operates several oil and gas properties in New Mexico. 
The Trust holds a net overriding royalty interest in those properties and, pursuant to
the terms of a "Conveyance," is entitled to receive a 75% interest in the net proceeds
from those properties. (2) Burlington is required by the Conveyance to issue quarterly
accounting statements to the Trust, and the Trust has 180 days to except to those
statements. 

 In October 2004, in order to resolve a number of specific existing "audit
disputes," the parties entered into an "Agreement Dealing with the Resolution of
Existing Audit Disputes" (the "Arbitration Agreement"). However, the parties
ultimately disagreed regarding the abitrability of one of the Trust's claims ruled upon
by the arbitrator. After the arbitrator ruled in favor of the Trust on this claim,
Burlington filed its application to vacate, modify, or correct the arbitration award. 

 The parties' dispute relevant to this appeal originates from Burlington's entry
into a settlement agreement in 1990 with the Gas Company of New Mexico
("GCNM") to resolve litigation involving properties covered by the Conveyance (the
"GCNM settlement agreement"). Pursuant to the terms of the GCNM settlement
agreement, Burlington received $54.5 million in settlement payments. At that time,
Burlington allocated $6.7 million of those proceeds to take-or-pay claims, $21 million
to past-pricing claims, and $26.8 million to future-pricing claims. In accordance with
the terms of the Conveyance, in calculating the amount of the GCNM settlement
proceeds owed to the Trust for its net overriding royalty interest, Burlington did not
include the $6.7 million allocated to the take-or-pay claims. As the Trust notes,
however, the Trust also was not burdened with a charge for any royalty payments due
to other royalty owners on that portion of the GCNM settlement. At that time, the
Trust did not challenge Burlington's allocation of the GCNM settlement proceeds or
Burlington's exclusion of the $6.7 million portion of the settlement in calculating the
amounts owed to the Trust.

 In 2001, Burlington entered into a settlement agreement with the Minerals
Management Service of the United States Department of Interior ("MMS") and the
Jicarilla Apache Indian Nation ("Jicarilla"), other royalty interest holders in
properties covered by the Conveyance (the "MMS/Jicarilla settlement"). Burlington,
MMS, and Jicarilla entered into the MMS/Jicarilla settlement in order to resolve
MMS's and Jicarilla's complaints regarding the amount of royalty payments due and
owing to them from the proceeds of the GCNM settlement. 

 The Trust asserts that as part of its MMS/Jicarilla settlement, Burlington agreed
to pay MMS and Jicarilla royalties on the $6.7 million portion of the GCNM
settlement that had been originally allocated to "non-royalty-bearing take-or-pay
claims." Burlington disputes the Trust's claim and asserts, to the contrary, that MMS
and Jicarilla expressly acknowledged that they were not entitled to royalty payments
on the $6.7 million portion of the GCNM settlement. Although the parties disagree
as to the whether MMS and Jicarilla received royalty payments on the $6.7 million
portion of the GCNM settlement, the Trust asserts that, following the MMS/Jicarilla
settlement, Burlington erroneously charged the Trust with its 75% share of the
MMS/Jicarilla settlement payment by deducting this charge from the amount of
proceeds due to the Trust for its net overriding royalty interest on the properties. The
Trust complained that the charge assessed against it by Burlington had been
calculated based on the full amount of the MMS/Jicarilla settlement, including the
$6.7 million originally allocated to take-or-pay claims. 

 The parties entered into the Arbitration Agreement to settle this "audit dispute"
and a number of other existing audit disputes, many of which are not relevant to this
appeal. The Arbitration Agreement, our focus in resolving the parties' dispute, states,
in relevant part, 

 3. Exhibit "C" attached hereto identifies audit exceptions that the
parties have identified for submission to binding arbitration pursuant to
the procedures set forth hereafter. . . . [T]he exceptions identified in
Exhibit "C" constitute the only items that will be subjected to
arbitration.


 4. Arbitration Agreement


 The existing audit disputes described on attached Exhibit "C," . . .
shall be finally settled by arbitration pursuant to the provisions hereof. 
This agreement to arbitrate applies only to the audit disputes identified
on Exhibit "C" . . . all of which shall be collectively referred to as the
"Audit Disputes."


 (a) The Audit Disputes shall be heard and determined by one
Arbitrator. . . . .


 (b) The proceeding shall be conducted in accordance with the
Commercial Arbitration Rules of the American Arbitration
Association, unless otherwise specified herein. . . . In the
event of a conflict between such Commercial Arbitration
Rules and this Agreement, this Agreement shall control.


(Emphasis added).

 Exhibit C, attached to the Arbitration Agreement, lists a number of audit
disputes, and, as Burlington emphasizes, includes a column entitled "Arbitrate
Amount," which details specific amounts at issue for each of the identified audit
disputes. On the first page of Exhibit C, the sum total "arbitrate amount" for all of
the audit disputes listed in Exhibit C, including many of which that are not relevant
to the underlying award or this appeal, is identified as $1,528,223. In fact, among the
numerous audit disputes identified on Exhibit C, only two specific disputes are
relevant to this appeal, and the total "arbitrate amount" for these two disputes is
identified as $374,978. The parties identified the first dispute as "Gross Proceeds
under stated due to excess royalties charged from MMS/Jicarilla settlement," and the
total arbitrate amount for that dispute is identified as $342,477. The parties labeled
their second dispute as "Interest Overcharged on MMS/Jicarilla Settlement," and the
total arbitrate amount for that dispute is identified as $32,501. There is no mention
of the GCNM settlement or any audit issues specifically relating to the GCNM
settlement anywhere in the Arbitration Agreement or Exhibit C.

 At the conclusion of the arbitration, the arbitrator entered an arbitration award
in favor of the Trust, including an award of over $6 million on the two relevant audit
disputes for the Trust's "75% share of additional gross proceeds resulting from the
reallocation of $6.7 million [of the 1990 GCNM settlement] to past pricing." In its
award, the arbitrator conceded that Burlington had objected to consideration of the
Trust's claim for its share of the $6.7 million in reallocated proceeds. However, the
arbitrator determined that it had jurisdiction to decide its "own jurisdiction" pursuant
to the terms of the Arbitration Agreement, which provided that the arbitration would
be conducted "in accordance with the Commercial Arbitration Rules of the American
Arbitration Association unless otherwise specificed." The arbitrator then cited in his
opinion Rule 7(a) of the Commercial Rules, which provides, "The Arbitrator shall
have the power to rule on his or her own jurisdiction, including any objections with
respect to the existence, scope or validity of the Arbitration Agreement." 
Commercial Rules of the American Arbitration Association, Rule 7(a).

 After determining that it had the power to decide arbitrability, the arbitrator
concluded that "the Trust's claim to its proportionate share of the $6.7 million
proceeds [from the 1990 GCNM settlement] is within the scope of the Arbitration
Agreement." The arbitrator contended that Exhibit C identified "an exception related
to the MMS/Jicarilla settlement" and that the Trust's claim arose from Burlington's
charging the Trust for additional royalty payments Burlington made to Jicarilla and
MMS to settle their claims even though Burlington had not shared the $6.7 million
portion on which the additional royalty payments had been calculated. Based on this,
the arbitrator stated,

 From the testimony and documents attached to the Arbitration
Agreement, it is clear that the dispute between the parties over the
MMS/Jicarilla [settlement] flows directly from Burlington's charge of
royalty on the $6.7 million initially attributed to take-or-pay. 


The arbitrator further concluded that there was a "nexus between the royalty charge
and the excluded $6.7 million" and that "an adjustment to gross proceeds to include
the Trust's proportionate share of the $6.7 million on which it has been charged
royalty is an arbitrable claim." 

 After determining the scope of its jurisdiction, the arbitrator stated that "[b]y
making this reallocation, Burlington characterized the entire $54.5 million GCNM
settlement proceeds (including the $6.7 million Burlington originally allocated to
take-or-pay) as past pricing in which the Trust is entitled to share." Thus, the
arbitrator ruled that the Trust was entitled to a 75% share of additional gross proceeds
from the reallocation of the $6.7 million to past-pricing claims.

 Following arbitration, Burlington filed an application to vacate or modify the
arbitration award. See 9 U.S.C. §§ 10, 11; see also Tex. Civ. Prac. & Rem. Code
Ann. §§ 171.088(a)(3)(A), 171.091(a)(2) (Vernon 2005). In its application,
Burlington asserted that, in awarding the Trust $6,243,990 on its claim for a portion
of the allegedly reallocated proceeds from the 1990 GCNM settlement (referred to in
the arbitration award as "MMS/Jicarilla--Case A"), the arbitrator rendered an award
on a matter not submitted to him and thereby exceeded his powers. Burlington
asserted that this portion of the arbitration award should be modified, corrected, or
vacated. Burlington also asserted a claim for breach of the Arbitration Agreement on
the ground that the Trust's attempt to assert a claim for a portion of the GCNM
settlement, i.e., its newly crafted MMS/Jicarilla--Case A, violated the agreement and
caused it to incur substantial unnecessary expenses in defending the arbitration and
pursuing relief in the trial court. The Trust filed a counterclaim for confirmation of
the arbitration award. The trial court rendered judgment in favor of the Trust,
denying Burlington's application and granting the Trust's application to confirm the
arbitration award. The trial court denied all other requested relief, including
Burlington's claim for breach of the Arbitration Agreement.

Arbitrability

 In its first issue, Burlington argues that the parties did not agree, by clear and
unmistakable language, to submit questions regarding the scope of arbitrable issues
to the arbitrator because the Arbitration Agreement itself "carefully limited the scope
of arbitration to identified audit disputes" and "withheld from the arbitrator [the]
power to decide any additional questions, including the question of arbitrability." 
The Trust counters that the parties' incorporation of the American Arbitration
Association ("AAA") rules clearly and unmistakably granted the arbitrator the power
to determine Burlington's objection to the scope of the arbitration. 

 In First Options of Chicago, Inc. v. Kaplan, the United States Supreme Court
stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter
(including arbitrability), courts generally [] should apply ordinary state-law principles
that govern the formation of contracts," with the qualification that, "when courts
decide whether a party has agreed that arbitrators should decide arbitrability," courts
"should not assume that the parties agreed to arbitrate arbitrability unless there is
'clea[r] and unmistakabl[e]' evidence that they did so." 514 U.S. 938, 944, 115 S. Ct.
1920, 1924 (1995) (citations omitted). The Supreme Court noted that "the law treats
silence or ambiguity about the question 'who (primarily) should decide arbitrability'
differently from the way it treats silence or ambiguity about the question 'whether a
particular merits-related dispute is arbitrable because it is within the scope of a valid
arbitration agreement'" so as to not "force unwilling parties to arbitrate a matter they
reasonably would have thought a judge, not an arbitrator, would decide." Id., 514
U.S. at 944-45, 115 S. Ct. at 1924-25; see also Gen. Motors Corp. v. Pamela
Equities Corp., 146 F.3d 242, 249 (5th Cir. 1998) ("[W]hen a party to a dispute
contends that he and the other disputant agreed to submit . . . the question of whether
that arbitrator had authority to arbitrate their dispute, that party must bear the burden
of demonstrating clearly and unmistakably that the parties agreed to have the
arbitrator decide that threshold question of arbitrability."); In re Weekley Homes, L.P.,
180 S.W.3d 127, 130 (Tex. 2005) ("[A]bsent unmistakable evidence that the parties
intended the contrary, it is the courts rather than the arbitrators that must decide
'gateway matters' such as whether a valid arbitration agreement exists. Whether an
arbitration agreement is binding on a nonparty is one of those gateway matters."); In
re Ford Motor Co., 220 S.W.3d 21, 23 (Tex. App.--San Antonio 2006, no pet.)
(same).

 Paragraphs 3 and 4 of the Arbitration Agreement expressly state that the audit
exceptions identified in Exhibit C "constitute the only items that will be subjected to
arbitration" and that the Arbitration Agreement "applies only to the audit disputes
identified on Exhibit C." Here, there is no clear and unmistakable statement in the
Arbitration Agreement that matters of arbitrability will be submitted to an arbitrator. 
In fact, Burlington and the Trust purposefully drafted an Arbitration Agreement of
very narrow scope. 

 Although, as the Trust emphasizes, the Arbitration Agreement generally
provides that the proceeding "shall be conducted in accordance with the Commercial
Arbitration Rules of the [AAA], unless otherwise specified herein," the Arbitration
Agreement further provides that the terms of the Arbitration Agreement control in the
event of any conflict with the rules. We conclude that there is no conflict because the
parties, in their Arbitration Agreement, unambiguously detailed the specific subjects
and amounts subject to arbitration, and arbitrability was not one of those matters. 
Even if we were to conclude, based, in part, on the authority cited below, that some
ambiguity was created by the parties' reference to the AAA rules, the parties simply
did not clearly and unmistakably submit the issue of arbitrability to arbitration.

 We recognize that Rule 7(a) of the Commercial Arbitration Rules of the AAA
grants an arbitrator "the power to rule on his or her own jurisdiction, including any
objections with respect to the existence, scope or validity of the Arbitration
Agreement." Commercial Rules of the American Arbitration Association,
Rule 7(a). We further recognize that, "[a]lthough the United States Court of Appeals
for the Fifth Circuit has not addressed the effect of a reference to AAA Rules
contained in an arbitration clause," (3) other courts have generally concluded that an
arbitration agreement's incorporation of rules empowering an arbitrator to decide
arbitrability clearly and unmistakably evidences the parties' intent to allow the
arbitrator to decide issues of arbitrability. See, e.g., Qualcomm Inc. v. Nokia Corp.,
466 F.3d 1366, 1372-73 (Fed. Cir. 2006) (concluding that agreement's incorporation
of AAA rules clearly and unmistakably showed parties' intent to delegate issue of
determining arbitrability to arbitrator); Terminix Int'l Co., LP v. Palmer Ranch Ltd.
P'ship, 432 F.3d 1327, 1332-33 (11th Cir. 2005) (holding that by incorporating AAA
Rules into arbitration agreement, parties clearly and unmistakably agreed that
arbitrator should decide whether arbitration clause was valid); Contec Corp. v.
Remote Solution, Co., 398 F.3d 205, 208 (2d Cir. 2005) ("[W]hen . . . parties
explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability,
the incorporation serves as clear and unmistakable evidence of the parties' intent to
delegate such issues to an arbitrator."); Citifinancial, Inc. v. Newton, 359 F. Supp. 2d
545, 549-52 (S.D. Miss. 2005) (holding that by agreeing to be bound by procedural
rules of AAA, including rule giving arbitrator power to rule on his or her own
jurisdiction, defendant agreed to arbitrate questions of jurisdiction before arbitrator);
Sleeper Farms v. Agway, Inc., 211 F. Supp. 2d 197, 200 (D. Me. 2002) (holding
arbitration clause stating that arbitration shall proceed according to rules of AAA
provides clear and unmistakable delegation of scope-determining authority to
arbitrator). We are also mindful that, in certain circumstances, the incorporation of
AAA rules may constitute clear and unmistakable evidence of an intent to allow an
arbitrator to decide issues of arbitrability. 

 However, we conclude, based on the express terms of the Arbitration
Agreement before us, that the agreement's mere reference to the AAA's rules does
not provide clear and unmistakable evidence of the parties' delegation of issues of
arbitrabilty to an arbitrator. In determining whether an agreement provides clear and
unmistakable language of such delegation, we consider the specific language of the
Arbitration Agreement. See Kaplan, 514 U.S. at 944, 115 S. Ct. at 1924 ("When
deciding whether the parties agreed to arbitrate a certain matter (including
arbitrability), courts generally [] should apply ordinary state-law principles that
govern the formation of contracts."). We also apply general principles of Texas
contract law governing the formation of contracts. See In re Dillard Dep't Stores,
Inc., 186 S.W.3d 514, 515 (Tex. 2006) (stating that ordinary principles of "[c]ontract
law determine[] the validity of arbitration agreements," a "trial court's determination
of an arbitration agreement's validity is a legal question," and "[t]he objective intent
as expressed in the agreement controls the construction of an unambiguous contract").
Here, the Arbitration Agreement restricted the arbitrator's reach only to specifically
identified "audit disputes," and for specific amounts. There is not a clear and
unmistakable indication that the parties authorized an arbitrator to decide the
arbitrability of claims or amounts not specifically identified in the Arbitration
Agreement. Moreover, the agreement provided that to the extent there was any
conflict between the parties' agreement and the AAA rules, any such conflict would
be resolved in favor of the agreement. 

 Although not directly on point, we note that the San Antonio Court of Appeals
has recently concluded that an arbitration agreement providing for any dispute to be
settled "in accordance with the rules and procedures of the AAA" did not contain
unmistakable evidence that the parties intended for an arbitrator to decide whether
nonparties were bound by the arbitration agreement. In re Ford Motor Co., 220
S.W.3d at 23-24. In so holding, the court highlighted "the established Texas law [of]
placing the initial burden of proving the existence of a valid arbitration agreement and
claims within the scope of that agreement on the party seeking to compel arbitration."
Id.

 We also find the opinion of the United States Court of Appeals for the Second
Circuit in Katz v. Feinberg helpful to our analysis. See 290 F.3d 95 (2d Cir. 2002). 
In Katz, the court found that the parties did not agree to arbitrate questions of
arbitrability. Id. at 96-97. The Katz court recognized that a "broadly worded
arbitration clause committing resolution of all disputes to arbitration" would satisfy
the clear and unmistakable standard. Id. at 97. However, the court could not
conclude that "where a single agreement contains both a broadly worded arbitration
clause and a specific clause assigning a certain decision to an independent
accountant, that the parties intention to arbitrate questions of arbitrability under the
broad clause remains clear." Id.

 Similarly, in James & Jackson, LLC v. Willie Gary, LLC, the Delaware
Supreme Court court recognized the "majority view" that an arbitration agreement's
reference to AAA rules might provide clear and unmistakable evidence of the parties'
intent to have an arbitrator determine arbitrability. 906 A.2d 76, 78, 80 (Del. 2006). 
However, the court stated that the majority view did not "mandate that arbitrators
decide arbitrability in all cases where an arbitration clause incorporates the AAA
rules." Id. at 80. Rather, the court stated, the majority view "applies in those cases
where the arbitration clause generally provides for arbitration of all disputes and also
incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." 
Id. The court noted that although the arbitration agreement before it required
arbitration of "any controversy arising out of or related to [the agreement]," it also
expressly authorized the non-breaching parties to obtain some limited types of relief
in the courts. Id. at 81. Thus, the court concluded, "despite the broad language" at
the outset of the arbitration agreement and the reference in the agreement to the AAA
rules, that "[s]ince this arbitration clause does not generally refer all controversies to
arbitration, the federal majority rule does not apply, and something other than the
incorporation of the AAA rules would be needed to establish that the parties intended
to submit arbitrability questions to an arbitrator." Id. 

 We recognize that the arbitration agreements in both Katz and James &
Jackson, LLC are quite different than the Arbitration Agreement before us. For
example, the Arbitration Agreement here does not contain any provisions assigning
decision-making authority on the specifically identified existing audit disputes to
anyone other than the arbitrator. However, both Katz and James & Jackson, LLC
illustrate the application of the principle that a court must carefully consider the
language of the specific arbitration agreement before it in determining whether the
parties have clearly and unmistakably ceded authority to decide matters of abitrabilty
to an arbitrator. See id.; Katz, 290 F.3d at 97. A court should not blindly apply the
majority view regarding the effect of mere reference to AAA rules and ignore the
"clear and unmistakable standard" set forth by the Supreme Court in Kaplan. See
Kaplan, 514 U.S. at 944, 115 S. Ct. at 1924. 

 Accordingly, we hold that Burlington and the Trust did not agree in the
Arbitration Agreement, by clear and unmistakable language, to submit questions
regarding the scope of arbitrable issues to the arbitrator. See id., 514 U.S. at 942-44,
115 S. Ct. at 1923-25.

 We sustain Burlington's first issue.

Scope of Arbitration Agreement

 In its second issue, Burlington argues that "construing the scope of the
arbitration agreement de novo," the Trust's claim for its "75% share of additional
gross proceeds resulting from the reallocation of $6.7 million to past pricing" is not
within the scope of the Arbitration Agreement. (4) 

 Burlington asserts that the audit disputes identified in Exhibit C to the
Arbitration Agreement confirm that (1) the parties agreed to arbitrate only the Trust's
complaint that its "gross proceeds were understated due to excess royalties" charged
against it based on the full value of the GCNM settlement and (2) the Trust's claim
for a 75% share of the $6.7 million portion of the allegedly reallocated GCNM
settlement proceeds was never contemplated by the parties to be an arbitrable claim. 
Rather, Burlington complains that the Trust asserted this new claim only after the
commencement of arbitration. Burlington notes that the expressly stated subject
matter of the first audit dispute was that Burlington, "in adjusting gross proceeds to
reflect the MMS/Jicarilla settlement[,] . . . improperly deducted royalties paid
supposedly on account of the $6.7 million in take-or-pay claims not covered by the
Conveyance." 

 In fact, the dispute to be arbitrated arose from the Trust's allegation that the
MMS/Jicarilla settlement was based upon the full amount of the GCNM settlement,
including the $6.7 million take-or-pay portion, that 12.3% of the MMS/Jicarilla
settlement, or approximately $500,000, was allocable to production in which the
Trust had no interest, and that the Trust should not have been charged for 75% of
those payments. Moreover, the Trust's complaint about the second audit dispute
simply concerned its claim for interest on the amount at issue in the first audit
dispute. In spite of these specifically identified and narrowly limited audit disputes,
the arbitrator ruled on a claim by the Trust that its "gross proceeds were understated,
not due to the deduction or charge of royalties paid to MMS and the Jicarilla tribe,
but, instead, due to the exclusion of $6.7 million of receipts under gas purchase
contracts in the GCNM settlement that [Burlington] has attributed to take-or-pay
obligations." Yet, as Burlington highlights, there is absolutely no mention of the
GCNM settlement in Exhibit C, nor is there any suggestion that the Trust would be
seeking to recover in arbitration approximately $6 million based on its theory that
Burlington had reallocated funds from its 1990 settlement. Burlington argues that
"the sheer numbers involved" in the Trust's newly asserted claim preclude it "from
being shoehorned into the 'excess royalties' concept" identified in Exhibit C.

 The Trust, on the other hand, asserts that the audit disputes describe its
complaint that Burlington had charged it with excess royalties relating to Burlington's
reallocation of the $6.7 million in take-or-pay claims without sharing those proceeds
with the Trust. The Trust notes that, despite the specific arbitrate amounts, Exhibit
C states that "[a]ll amounts stated are subject to change." The Trust asserts that this
language justifies the arbitration award of over $6 million, even though the relevant
"arbitrate amount" for the two audit disputes was $374,978. The Trust, as additional
support for its claim for a 75% share of the full value of the GCNM settlement, cites
a November 1, 2002 letter from it to Burlington stating,

 The Trust was not paid any royalties on the take-or-pay settlement
[of 6.7 million]. The Trust did not pursue a claim for royalties on that
amount, and does not now want to be assessed any portion of the current
settlement which is attributable to royalties which should have been paid
to the MMS or Jicarillas on the take-or-pay portion because the Trust did
not share in the economic benefits attributable to the take-or-pay
settlement in 1990. If the "major portion" settlement took into account
the take-or-pay claim, the amount allocated to the Trust should be
reduced . . . 


If instead the 1990 settlement was "reallocated" such that more or all of
the amount received by Burlington's successor [sic] was treated as "past
pricing" or "contract buyout," then the Trust is entitled to 75% net
overriding royalty interest on the 6.7 [million] no longer allocable to
take-or-pay.


 Based on this letter, the Trust asserts that it "made clear" throughout its dispute
"its complaint that Burlington improperly had charged the Trust with royalty on
settlement proceeds without sharing those proceeds with the Trust" and "the
alternative remedies that it was seeking . . . [to] either eliminate the charge to the
Trust of the royalties on the proceeds or give the Trust its share of the proceeds." The Supreme Court stated in Kaplan that if "the parties did not agree to submit
the arbitrability question itself to arbitration, then the court should decide that
question just as it would decide any other question that the parties did not submit to
arbitration, namely, independently." Kaplan, 514 U.S. at 943, 115 S. Ct. at 1923-24.
 The Federal Arbitration Act provides that a court may vacate an arbitration award
"where the arbitrators exceeded their powers, or so imperfectly executed them that
a mutual, final, and definite award upon the subject matter submitted was not made"
and may modify or correct an arbitration award "[w]here the arbitrators have awarded
upon a matter not submitted to them." 9 U.S.C. §§ 10, 11; see also Tex. Civ. Prac.
& Rem. Code Ann. §§ 171.088(a)(3)(A) (providing that court shall vacate award if
arbitrators exceed their powers), 171.091(a)(2) (providing that court shall modify or
correct award if "the arbitrators have made an award with respect to a matter not
submitted to them and the award may be corrected without affecting the merits of the
decision made with respect to the issues that were submitted"). 

 In reviewing the arbitrator's decision independently, we recognize the strong
presumption under the Federal Arbitration Act of favoring arbitration. See In re D.
Wilson Constr. Co., 196 S.W.3d 774, 782-83 (Tex. 2006). Furthermore, we note that
any doubt as to whether a party's claim falls within the scope of an arbitration
agreement must be resolved in favor of arbitration. Id. Also, a court should not deny
arbitration unless it can be said with positive assurance that an arbitration clause is
not susceptible to an interpretation that would cover the dispute at issue. Id.; see also
In re Dillard Dept. Stores, Inc., 186 S.W.3d at 516. Of course, "the policy that favors
resolving doubts in favor of arbitration cannot serve to stretch a contractual clause
beyond the scope intended by the parties or authorize an arbiter to disregard or
modify the plain and unambiguous provisions of the agreement." Smith v. Transp.
Workers Union of Am., AFL-CIO Air Transp. Local 556, 374 F.3d 372, 375 (5th Cir.
2004) (citations omitted); see also Belmont Constructors, Inc. v. Lyondell
Petrochemical Co., 896 S.W.2d 352, 356 (Tex. App.--Houston [1st Dist.] 1995, no
writ) (stating that "federal policy of resolving doubts in favor of arbitration" cannot
stretch contractual clause beyond scope intended or allow modification of plain and
unambiguous provisions).

 With these principles in mind, and reviewing the arbitrator's decision
independently, we conclude that the relevant audit disputes describing the Trust's 
complaint about its understated gross proceeds due to Burlington's charge of excess
royalties from the MMS/Jicarilla settlement is not susceptible to an interpretation for
an alternative claim by the Trust for a 75% interest in the allegedly reallocated
proceeds of $6.7 million portion of the 1990 GCNM settlement. We can say, with
positive assurance, that by making a claim for reallocated proceeds from the 1990
GCNM settlement, the Trust was making a separate and new claim rather than a
claim covered by the "audit disputes" contemplated by the parties in the Arbitration
Agreement. The inescapable fact is that the Arbitration Agreement provided specific
"arbitrate amounts" for each of the identified audit disputes, and the amount
ultimately awarded by the arbitrator on the Trust's newly asserted claim greatly
exceeded, beyond any amount that could have reasonably been contemplated by the
parties, the amounts identified in the Arbitration Agreement. As the Trust points out,
the Arbitration Agreement did provide that the arbitrate amounts were "subject to
change"; however, the inclusion of this language cannot justify the assertion of a
wholly separate claim. Again, the 1990 GCNM settlement is not mentioned in the
Arbitration Agreement. Allowing the Trust to assert a claim for over $6 million
shortly after executing an agreement identifying the arbitration amounts for the
relevant audit disputes to be approximately $375,000 stretches the Arbitration
Agreement beyond its breaking point. Had the parties intended to arbitrate the
Trust's claim for reallocated proceeds from the 1990 GCNM settlement, the parties
could have included a reference to this settlement in the Arbitration Agreement and
stated the appropriate arbitrate amount. 

 The Trust contends, in post-submission briefing, that "the parties were not
required to include in Exhibit C all sub-issues entailed within that general description
of the dispute and the alternative remedies to which the Trust might be entitled,
depending on facts that were solely within the control of Burlington and which
became known to the Trust only following discovery undertaken in the course of
arbitration proceedings." First, one cannot reasonably conclude that a claim for over
$6 million for allegedly reallocated proceeds from the 1990 GCNM settlement
qualifies as a "sub-issue" of a specific "audit dispute" over understated gross
proceeds in the amount of $374,978. Second, the Trust's admission that it did not
learn of the underlying facts supporting its newly asserted claim until after the
commencement of arbitration establishes that such a claim was not one of the
"existing" audit disputes between the parties to be resolved by the Arbitration
Agreement. Finally, we cannot, as suggested by the Trust, rely on its November 2002
letter as "clearly" putting Burlington "on notice of the Trust's position" that it was
always seeking alternative remedies. Rather, the unambiguous provisions of the
Arbitration Agreement, setting forth detailed descriptions of the relevant audit
disputes and the associated arbitrate amounts, control our inquiry. See In re Dillard
Dept. Stores, Inc.,186 S.W.3d at 515 (stating that "[t]he objective intent as expressed
in the agreement controls the construction of an unambiguous contract"). 

 In sum, the Arbitration Agreement cannot reasonably be interpreted as
authorizing the Trust's claim for its 75% share of the full value of the 1990 GCNM
settlement proceeds. Accordingly, we hold that the Trust's claim was "clearly beyond
the agreed scope of the arbitration," the arbitrator exceeded his powers in ruling on
the Trust's claim, and the arbitrator entered an award on a matter not properly
submitted to him. We further hold that the trial court erred in confirming the
arbitration award. 

 We sustain Burlington's second issue. 


Conclusion


 We reverse the portion of the trial court's judgment confirming the portion of
the arbitration award awarding the Trust $6,243,990 (labeled in the arbitration award
as "MMS/Jicarilla-Case A"), vacate that portion of the arbitration award, and modify
the award to reflect that this award has been vacated. We render a take-nothing
judgment in Burlington's favor on the Trust's claim giving rise to the arbitration
award of $6,243,990. We also reverse the portion of the trial court's judgment
denying Burlington's claim for breach of the Arbitration Agreement, and we remand
for further proceedings consistent with this opinion.



 Terry Jennings

 Justice


Panel consists of Justices Nuchia, Jennings, and Higley.
1. To avoid confusion, we make no distinction between Burlington and its predecessor,
Southland Royalty Company ("Southland").
2. The Trust explains that "[t]he overriding royalty interest is a 'net' interest, in the sense
that Burlington, in calculating the payments to which the Trust is entitled, includes
certain revenues (including proceeds from the sale of production from the properties)
and certain expenses incurred in the operation of the properties (including royalties
on production paid to royalty owners holding royalty interests in the properties)."
3. Citifinancial, Inc. v. Newton, 359 F. Supp. 2d 545, 551 (S.D. Miss. 2005).
4. Having held that the Arbitration Agreement does not clearly and unmistakably
evidence the parties' intent to delegate the issue of determining arbitrability to the
arbitrator, we need not consider Burlington's alternative contention in its second issue
that even if the arbitrator is afforded "considerable leeway" in construing the scope
of the arbitration agreement, the parties' dispute is "clearly beyond the agreed scope
of the arbitration." See Kaplan, 514 U.S. at 943, 115 S. Ct. at 1923-24.